UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE L. GLOVER,

    Plaintiff,

Case No. 1:21-cv-508

Hon. Hala Y. Jarbou

v.

UNKNOWN CHANDLER,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983 by plaintiff Maurice L. Glover ("Glover"), a state prisoner in the custody of the Michigan Department of Corrections (MDOC). Plaintiff named one defendant, Sgt. Dwight Chandler. This matter is now before the Court on defendant Chandler's motion for summary judgment (ECF No. 17).

**I.**    **Background**

Glover set forth the following allegations. Sometime between 10:50 p.m. on November 25, 2020, and 12:00 a.m. on November 26, 2020, Glover was laying on his cell floor with excruciating stomach pain and trouble breathing. Compl. (ECF No. 1, PageID.1-2). Glover sent his cellmate, Brandon Waterman, to notify the corrections officers about his situation. *Id*. Several minutes later, corrections officer (CO) White checked on plaintiff. *Id*. at PageID.2. CO White said he had to leave due to the shift change but that he would pass the word on to the officers coming on the new shift. *Id*. CO White told Waterman to keep Glover talking until help came. *Id*.

About 15 or 20 minutes later, defendant Sgt. Chandler arrived with the unit officers. *Id*. Glover explained how he was feeling. *Id*. Chander knew that Glover had gone to health care earlier that day alleging stomach pain. *Id*. While Glover laid on the floor with excruciating stomach pain and taking short breaths, Chandler watched him and refused to provide medical care. *Id*. After some time, handler told Glover that "he didn't have all night to stand at the cell and watch him" and that Glover "could either stay on the floor or go to healthcare, but there was no medical personnel on 3rd shift." *Id*. Glover asked to be taken to health care. *Id*. Several minutes later, officers picked Glover off of the floor and wheeled him to health care. *Id*.

Glover was strapped to the stretcher in the health care waiting room with Sgt. Chandler. *Id*. "Sgt. Chandler stated since there was no nurses working 3rd shift that he and Glover would have to sit there and wait until first shift came in for Glover to see a nurse, but sending Glover to the hospital was not an option." *Id*. at PageID.2-3. Glover alleged:

> 15. After several minutes, Glover began to hyperventilate and shake. He asked Sgt. Chandler if he could have a glass of water. Sgt. Chandler went to the nurses area to get the water and returned several minutes later saying he found a nurse back there.
>
> 16. Sgt. Chandler called some officers in to unstrap Glover from the stretcher. They put him in a wheelchair and wheeled him in to the nurse's office. The nurse just happened to be the same nurse Glover had seen earlier that previous day.
>
> 17. The first thing [the nurse] said when she saw Glover was "He was here earlier. We have to admit him to the hospital." Glover doesn't know how much time passed while she did the paperwork. After a while, Glover was taken to the control center. He was dressed and taken to the hospital by van.
>
> 18. Once he reached the emergency room, all Glover remembered was the doctor telling him that his appendix ruptured and his body was filled with 90% feces and poison, and he was covid-19 positive. Doctors told Glover he was lucky to be alive, battling two deadly diseases at the same time. If it was two hours later, nothing could be done.

*Id*. at PageID.3. Glover alleged that Sgt. Chandler's actions violated his rights under the Eighth Amendment. *Id*. Glover seeks compensatory damages, punitive damages, and other relief. *Id*. at PageID.4.

### II.     Defendant Sgt. Chandler's motion for summary judgment

### A.      Legal standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.    Eighth Amendment claims

#### 1.    Legal Standard

Glover seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Here, Glover claims that "Sgt. Chandler's failure to provide immediate and emergency medical care was done maliciously and sadistically and constituted cruel and unusual punishment in violation of the [E]ighth Amendment." Compl. at PageID.3. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the

4

officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id*. at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). "[T]his care qualifies as 'cruel and unusual' only if it is 'so grossly incompetent' or 'so grossly inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021). "For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony." *Id*.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id*. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited

by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

In this case, Sgt. Chandler was not a medical provider. In determining whether Chandler was deliberately indifferent to Glover's serious medical needs, the Court views his actions as that of a layperson, not as the actions of a doctor or a nurse. "[B]ecause police officers and prison guards are laypersons, not physicians, we must determine if a layperson would easily recognize the necessity for a doctor's attention under the circumstances presented." *Estate of Harbin v. City of Detroit*, 147 Fed. Appx. 566, 571 (6th Cir. 2005) (internal quotation marks, citations and brackets omitted). "As *Farmer* makes clear, the officers must not only be aware of the facts from which they could draw the inference that [a prisoner] had a serious medical need, they also must draw that inference." *Id.*, citing *Farmer*, 511 U.S. at 837.

### 2. Discussion

This lawsuit involves Sgt. Chandler's interaction with Glover during the night of November 25th and the early morning hours of November 26th. At his deposition, Glover gave the following testimony. On or about November 23, 2020, Glover was having stomach pains, was bloated, could not use the bathroom, and "was taking Tums and stuff like that" for relief. Glover Dep. (ECF No. 18-2, PageID.73). After two days (November 25th), Glover reported his situation to a second shift officer (CO White) and went to healthcare where the nurse gave him some Mylanta and Tylenol, and told him "if the pain worsens or anything gets worser, to come back." PageID.74. At the time, Glover also had breathing complications due to COVID. *Id*.

Glover took the Tylenol and went to lay in bed. *Id*. His stomach was very painful. *Id*. His cellmate was out. *Id*. Glover tried to get out of bed, walked around, and collapsed on the floor. *Id*. He told the cellmate "to tell the officers that I needed to go to the hospital 'cause something was wrong with me." PageID.74-75.

Glover's cellmate retrieved CO White, who said that there was a shift change, and that he would relay everything to the next shift officers. PageID.75. After the shift change, the officers called for defendant Sgt. Chandler. *Id*. Chandler arrived less than an hour after the officers changed from second to third shift. PageID.76. COs Nichols and Scott waited with Glover until Sgt. Chandler arrived. *Id*.

Glover was on the floor when Sgt. Chandler arrived. Glover testified as to their interaction as follows:

> [T]he first thing he said was, "What did you take?" And I told him, I said, "I can't -- I can't hear you. What did you ask me?" He said, "What did you take?" And I said, "I don't do drugs or nothing if you're referring to that." And he was like, "So what's going on?" So I tried, you know, between short breaths to explain to him what I was feeling at the time, and after I explained to him, it was just a long pause. He was just standing there -- he was just standing up at the cell looking down at me. So the shift officers got to talking to him letting him know, you know, this is our porter. He don't do no drugs, he don't get in no trouble, something is really wrong with him. He needs to go to the hospital. And so he still stood there for I don't know how long. And then as the officers was talking to him, you know, a few inmates got riled up and they was saying, you know, basically yelling that I need to go to the hospital, something is wrong with me. And then he says, "Well, I can't do nothing about it, 'cause you ain't told me what was wrong with you." So I tell him, I said, "I barely can breathe, I'm in pain, and I feel like I'm dying." And I kept -- and then I started crying and got to begging him "Don't let me die on the cell floor, I feel like I'm dying." So after -- I don't know how long that took, he stood there. But he says, "Well, I can't sit up here and babysit you all night. You either stay on the floor or go to healthcare." So I said, "If I stay on the floor, I'm going to die." I said, "Can you take me to healthcare?" He said, "Well, I can take you to healthcare, but I already told you there's no third-shift medical personnel to see you." So, I just told him, "Well, I still -- I need to get out of here off this floor." So he asked me, he said, "Well, can you get up and get in a

7

> wheelchair?" And I told him, I said, "I barely can breathe." So I guess that he called for a gurney or whatever, and I don't know how long that took to get there, but know they -- they brought the gurney up to the cell. About four or five officers picked me up and put me on a gurney and they wheeled me to healthcare. So once we get in the healthcare room, it's just me and -- well, we in the waiting room. It's just me and Sergeant Chandler. And so he said, "Well, we going to have to sit here for third shift because there's no third shift medical personnel like I told you back at the unit." So I'm sitting there for a moment and I'm feeling crazy. I don't know what – I'm feeling crazy, I get to hyperventilate. So I said, "Can I please get some water or something? I feel crazy." So he goes back by the nurse's station and he returns like three minutes later. He don't have the water, but he cussing. And was like, "I'm not cussing at you." He said, "She had me back there hiding." So he was talking about a nurse. So he called some officers in, they take me off the gurney and put me a wheelchair and take me to the back office where she at. As soon as she seen me, it just so happened to be the same nurse that I saw earlier that day on the 25th that gave me the Mylanta. So as soon as she seen me, she said, "Oh, he was here earlier today. Something is wrong with him, he needs to go to the hospital." So he says, "Well, okay. Do the paperwork, call a doctor, get the permission." And he calls some officers and -- to go get me some dress out clothes. I don't know how long this took, I just know they took me up to the control booth, they dressed me out, waited for the van to head up, and the emergency room is four minutes away, and took me to the emergency room, and that was that.

PageID.77-79.

During the deposition, Glover admitted that Sgt. Chandler remained with him from the time Chandler arrived on the scene until Glover saw the nurse. PageID.79-80. Glover stated that did not hear Sgt. Chandler call anyone at healthcare or anyone "on call with healthcare." PageID.80. However, Glover also admitted that he "was going through so much pain" that he did not "even know the timings of what was going on" and that he was unconscious at some point because he does not remember everything. *Id*.

Glover admits that neither he nor Sgt. Chandler knew that his appendix had ruptured. PageID.81. However, Glover felt that Sgt. Chandler "should have been more concerned" because he was in the COVID unit. *Id*. In retrospect, Glover believed that some of

8

his symptoms were caused by COVID and others from the appendix. When asked which symptoms were from COVID and which were from the appendix Glover responded:

> I don't -- I believe from, you know, observing others, the fatigueness and the headaches and the -- the fatigueness and the headaches is the – that's probably from COVID, and cold sweats. But the acid reflux, that's probably from the appendix.

PageID.82. Glover also testified that he did not retain and expert witnesses to testify about his medical conditions. *Id*.

Sgt. Chandler addressed the incident in an affidavit stating:

> 3. On November 25, 2020, I was working third shift at DRF and reported for duty around 11:00 p.m.
>
> 4. During the shift I responded to a radio call from one of the 900 Unit Officers. When I arrived, Plaintiff Glover was on the floor in his cell. I approached him, asking what was wrong and he reported he had abdominal pain/cramps, he had not eaten or drank much, he had not had a bowel movement in over 24 hours as well as being short of breath because taking a deeper breath made the pain worse. I called the on-call provider and relayed the information I had received from Plaintiff Glover. The provider advised me to watch Plaintiff Glover for a couple hours, get him some water and see if he'll have a bowel movement.
>
> 5. At the time, DRF did not have a nurse regularly scheduled to [sic] on third shift.
>
> 6. I made the decision to take Plaintiff Glover to the healthcare area to carry out the objectives given by the on-call provider.
>
> 7. After arriving to healthcare, I began to look for a cup to get Plaintiff Glover some water when I discovered that a second shift nurse was still on the premises.
>
> 8. After my third call to the on-call provider, the provider directed the nurse to perform an assessment. After the assessment the nurse consulted with the on-call provider again who advised her to send Plaintiff Glover to the hospital by state car.

Chandler Aff. (ECF No. 18-3, PageID.85-86).

Sgt. Chandler sent an e-mail regarding two incidents which involved the nursing staff during his shift.  The second incident involved Glover.  Sgt. Chandler stated in pertinent part:

> Second, we had a prisoner in 900 unit complaining of abdominal cramps and being constipated yesterday. He was difficult to hear and provided very minimal information. PA Spearling advised to keep an eye on the prisoner for a couple hours, have him drink some water and try to have a bowel movement. We moved the prisoner to the healthcare waiting room in an attempt to accomplish these objectives as well as get out of the noisier and potentially volatile environment in 900 bldg. Once we were in Healthcare I began looking for a cup to use to give the prisoner water. Upon opening the door to the main treatment room I was surprised to see a nurse in there on the computer.
>
> Here's the most disturbing part to me.
>
> • She never answered in the 3rd shift initial radio check.
>
> • She never answered the phone or radio when the west school officer was looking for healthcare (the first item above).
>
> • She never answered or responded to the "medical emergency" call in 900 bldg. over the radio.
>
> Third shift supervisors never knew a nurse was still on grounds. . .

Chandler e-mail (ECF No. 18-3, PageID.88).

The Court has also reviewed the records submitted with Glover's response, which consisted of: hospital records from his admission at 2:45 a.m. on November 26, 2020 through his discharge on December 7, 2020 (ECF No. 20-1, PageID.111-115); a positive COVID test from a sample taken on November 23, 2020 (ECF No. 20-2, PageID.116); and the declaration of Glover's cellmate, Brandon Waterman (ECF No. 20-3, PageID.117-119).

The medical records reflect that Glover presented at the hospital emergency department with abdominal pain, COVID, and pneumonia, with a later CT scan showing evidence

of acute appendicitis.  PageID.111-112.  The COVID test established that Glover tested positive for COVID.  PageID.116.  Finally, prisoner Waterman's declaration recites some events relevant to this lawsuit: that Glover saw a nurse on November 25th; that the nurse gave him a laxative; that Waterman left the cell around 10:00 p.m. to use the telephone; that when he returned Glover was on the cell floor; that he notified CO White of Glover's condition and request to go to the hospital; that he stayed with Glover as directed by CO White; that when Sgt. Chandler arrived, he told Waterman to go to the dayroom; and that Waterman stood by the officer's desk where he could see what was going on and "could faintly hear what was being said."  Waterman Decl. at PageID.117-118.  Waterman further stated: that Glover had been his cellmate for two years and that he knew that Glover needed to go to the hospital; that "[i]t was looking like they didn't want to send him to the hospital, so me and a few other inmates started yelling to send him to the hospital; that "I saw the officers pleading with Sgt. Chandler to send Glover to the hospital"; and that after a while, some officers picked Glover up from the cell floor, put him on a stretcher, and wheeled him out of the unit.  *Id*. at PageID.118.

Based on this record, Glover has failed to establish that Sgt. Chandler was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  As an initial matter, Glover met the objective component of an Eighth Amendment claim.  There is no question that Glover had serious medical needs: he was in the COVID unit; lying on the floor; had breathing problems; and was in pain.

However, Glover has failed to establish the subjective component of the claim.  It is undisputed that Sgt. Chandler remained with Glover from the time Chandler arrived at the cell until the nurse examined Glover in healthcare.  In his affidavit, Sgt. Chandler stated that he was

11

in contact with the on-call medical provider (later identified as PA Spearling) and followed the provider's instructions to watch Glover for a couple hours, get him some water, and see if Glover would have a bowel movement.  While Glover did not recall Sgt. Chandler having a conversation with PA Spearling, Glover did not rebut Chandler's recollection of these events.  As discussed, Glover admitted to gaps in his memory: he was in pain; he could not remember a timeline of events; and he was unconscious at some point.  In addition, Sgt. Chandler's e-mail recounted the events, including his apparent frustration with nursing staff.  Based on this record, Sgt. Chandler recognized the necessity for a doctor's attention under the circumstances presented and sought out medical care for Glover.  *See Estate of Harbin*, 147 Fed. Appx. at 571.  There is no evidence that Sgt. Chandler intentionally denied Glover's access to medical care or intentionally interfered with a prescribed treatment.  *See Estelle*, 429 U.S. at 104-05.  On the contrary, Sgt. Chandler provided Glover with the treatment prescribed by the medical provider, PA Spearling.  For all of these reasons, Sgt. Chandler's motion for summary judgment should be granted.[1]

### III.    Recommendation

For the reasons set forth above, I respectfully recommend that defendant Chandler's motion for summary judgment (ECF No. 17) be **GRANTED** and that this matter be **DISMISSED**.

Dated:   July 17, 2023                            /s/ Ray Kent
                                                  RAY KENT
                                                  United States Magistrate Judge

---

[1] The Court notes that defendant Chandler also sought summary judgment on the affirmative defense of qualified immunity. *See* Defendant's Brief at PageID.64-66.  Because there was no constitutional violation, it is unnecessary to address Chandler's arguments addressing this affirmative defense.

**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).